**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-CV-2187

ANDRU KULAS,

      Plaintiff,

v.

CITY OF FORT COLLINS,
KEVIN PARK, Fort Collins Police Officer, in his individual capacity, and
AVERY HANZLICEK, Fort Collins Police Officer, in his individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Andru Kulas, by and through his attorneys Sarah Schielke of The Life & Liberty Law Office LLC and Matthew Haltzman of the Haltzman Law Firm, P.C., respectfully alleges for his *Complaint and Jury Demand* as follows:

## I.  INTRODUCTION

1.  This is an action for damages and other relief against the Defendants pursuant to 42 U.S.C. § 1983 and § 13-21-131, C.R.S. for violations of Plaintiff Mr. Kulas's civil constitutional rights to be free from excessive force, unreasonable seizure, and wrongful arrest.

2.  On August 29, 2021, Defendants violated Plaintiff's constitutional rights under the Fourth, Fourteenth, and First Amendments to the U.S. Constitution and Plaintiff's constitutional rights under section 7 of Article II of the Colorado state constitution.

3.  Defendant Park without legal justification or provocation, tackled and deployed pepper spray directly into Plaintiff Mr. Kulas's open eyes from just two inches away, causing him blindness,

extreme pain, and suffering. This outrageous use of excessive force upon Mr. Kulas was Officer Park's reaction to Mr. Kulas declining to hold onto a paper summons that had been handed to him. Mr. Kulas had done nothing threatening to either officer and in fact was simply attempting to walk away from the officers when Defendants Park and Hanzlicek launched this unlawful attack.

4. Defendant Fort Collins Police Services has a long and well-documented history of employing excessive force on non-threatening individuals and, specifically, of employing pepper spray on non-threatening individuals for non-threatening actions like merely walking away from an officer.

5. Defendant Fort Collins Police Services has regularly ratified, condoned, and approved of these constitutional violations by its officers and in this case as well, following an excessive force complaint made by Mr. Kulas, again subsequently expressly ratified such misconduct by Defendants Park and Hanzlicek.

6. The Defendants' actions caused Plaintiff Mr. Kulas to endure pain, suffering, humiliation, emotional distress, anxiety, terror, attorney fees, and other damages.

## II. JURISDICTION AND VENUE

7. This action arises under the Constitution and laws of the United States and the State of Colorado, including Article III, section 1 of the United States Constitution and Title 42 U.S.C. § 1983.

8. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

9. This Court has authority to grant the declaratory relief sought pursuant to 28 U.S.C. § 2201.

10. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

11. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado or were directed at individuals within the State of Colorado.

### III. PARTIES

12. Plaintiff, Andru Kulas, is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado. He resides in the City of Fort Collins, State of Colorado.

13. Defendant Kevin Park is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Fort Collins in Fort Collins, Colorado. At all times relevant hereto Defendant Park was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Officer Park is a named Defendant in his individual capacity.

14. Defendant Avery Hanzlicek is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Fort Collins in Fort Collins, Colorado. At all times relevant hereto Defendant Hanzlicek was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Officer Hanzlicek is a named Defendant in his individual capacity.

15. Defendant City of Fort Collins (referred to herein interchangeably as "the City," "Fort Collins," and "FCPS") is a Colorado municipal corporation and is the legal entity responsible for itself and for Fort Collins Police Services ("FCPS").

## IV. FACTUAL ALLEGATIONS

***Defendants wrongfully seized and arrested Mr. Kulas, and used excessive force in doing so.***

16. On July 4, 2021, Mr. Kulas's dad passed away suddenly from a pulmonary embolism. Mr. Kulas had no other family. His father's unexpected death left him with no one. He was devastated.

17. August 28, 2021 would have been Mr. Kulas's dad's birthday. He was filled with grief and still utterly depressed. Two of his friends, knowing how much he would be suffering that day, didn't want Andru to have to be alone. They convinced him to come out and have some drinks with them to take his mind off of this significant and sad date.

18. Later that night, early in the morning of August 29, 2021, at approximately 1:50 am, officers with Fort Collins Police Services contacted Plaintiff Andru Kulas near the intersection of College and Mountain Avenues in Old Town Fort Collins in response to a call alleging third degree trespass, a petty offense.

19. An individual identified as Nicholas Muellerleile had reported two males had gone onto the rooftop of a bar where he said there were "No Trespassing" signs located.

20. Multiple FCPS officers responded to investigate this petty trespass call.

21. Some portions of the factual allegations described herein were captured by the Defendant officers bodyworn cameras. Those videos are made part of the factual allegations of this Complaint and have been attached as conventionally submitted **Exhibit 1** (Park Bodyworn Camera) and **Exhibit 2** (Hanzlicek Bodyworn Camera).

22. Upon arrival several minutes later, the FCPS officers found Mr. Muellereile and interviewed him. Mr. Muellerleile claimed that it was Plaintiff Mr. Kulas and his companion Nicholas Byers who had been on the roof without permission. He admitted that Mr. Kulas and Mr. Byers

were no longer on or near the rooftop but told FCPS officers he could lead them to where Mr. Kulas and Mr. Byers were now located.

23. Mr. Muellerleile pointed out to FCPS officers Mr. Kulas and Mr. Byers, who were now across the street at a food stand eating burritos they had purchased, and bothering no one.

24. Defendant Officer Avery Hanzlicek and FCPS Officer Andrew Ortiz went across the street to contact and interrogate Mr. Kulas and Mr. Byers.

25. Officer Hanzlicek reached Mr. Kulas first and told him he needed to speak with him. Mr. Kulas said he did not want to talk to Officer Hanzlicek and began to walk away. Officer Hanzlicek grabbed Mr. Kulas's arm and pulled him towards him, and told him he had to speak to him. Mr. Kulas told Officer Hanzlicek not to touch him and asked what he was bothering him for.

26. Officer Hanzlicek asked Mr. Kulas for his ID. Mr. Kulas provided Officer Hanzlicek his ID.

27. After speaking with Mr. Kulas and Mr. Byers, and then speaking with each other, officers Hanzlicek and Ortiz decided they had probable cause to issue a summons to Mr. Kulas and Mr. Byers for petty offense third degree trespass.

28. Officer Hanzlicek began writing a summons to Mr. Kulas for petty third degree trespass.

29. Mr. Kulas was eating his burrito and standing a safe and appropriate distance away from Officer Hanzlicek as he wrote the summons.

30. Mr. Kulas and Mr. Byers had previously explained to the officers that they were trying to find the guys that had injured Mr. Byers' girlfriend moments prior. The officers ignored these comments. The officers' inaction and lack of concern for Mr. Byers's girlfriend led Mr. Kulas to begin making several comments critical of the police officers.

31. Defendant Officer Kevin Park arrived during this time. Defendant Park observed that Mr. Kulas's hands were occupied with eating his burrito and that Mr. Kulas was also standing a

respectful and non-threatening distance from the officers while the summons was written and while he made his various comments criticizing the officers.

32. Defendant Park, growing angry at Mr. Kulas and desiring to retaliate against him for his critical comments, began ordering Mr. Kulas to "get back" from Officer Hanzlicek while Hanzlicek finished writing the summons. There was no need for this but Mr. Kulas nevertheless complied with the order and backed further away from Hanzlicek. As he did so, he said, "I'll back away and I'll still talk my piece because that's my right."

33. Defendant Park angrily told Mr. Kulas "you don't have rights right now."

34. Officer Hanzlicek finished writing the summons and citation for Mr. Kulas. The officers informed Mr. Kulas that he was being charged with petty trespass and began explaining the summons to him.

35. Mr. Kulas backed away from the officers and told them he was not signing anything. Officer Hanzlicek told Mr. Kulas that he did not need to sign the citation.

36. Defendant Park, unable to contain his anger towards Mr. Kulas any longer, abruptly took over the encounter. He snatched the summons out of Hanzlicek's hand, and told Mr. Kulas that he needed to take the summons. Mr. Kulas refused, as was his right. Defendant Park, demonstrating that he knew that Mr. Kulas had the right to decline accepting the physical summons, told Mr. Kulas that if he didn't have the summons, he wouldn't know his court date, and then when he missed his court date, a warrant would issue for his arrest.

37. Mr. Kulas said that was fine. He informed them that he would have his attorney find out the court date and ensure he showed up as necessary. He told the officers they could keep his ID as well.

38. Defendant Park ignored this and charged at Mr. Kulas, in an effort to *physically force* Mr. Kulas to take the summons. Mr. Kulas, reasonably fearing for his safety, began backing up and saying "no, no, no."

39. As a legal matter, Defendant Park had at this point completed personal service on Mr. Kulas. He had attempted to hand the summons to Mr. Kulas who was properly identified to him and he had explained the potential consequences (not knowing his court date) of not taking the summons with him. At this point, if Mr. Kulas didn't want to take the document, that was Mr. Kulas's right and choice.

40. Rather than leave Mr. Kulas alone and move on, however, Defendant Park decided to escalate the encounter by aggressively and menacingly pursuing after Mr. Kulas (who was walking away) and deploying excessive physical violence.

41. Defendant Park crumpled up the summons and then, advancing on Mr. Kulas, tried to jam it into the front pocket of Mr. Kulas's blazer. Mr. Kulas backed away from Park as he did so, repeatedly saying "no, no."

42. It is worth noting that at this juncture:

    a.  No one had told Mr. Kulas he was not free to leave.

    b.  Since the summons was completed and offered to Mr. Kulas, Mr. Kulas was in fact free to leave.

    c.  Mr. Kulas had not, in the seconds since the summons was completed and offered to him, committed any new offense for which he could be detained or seized.

    d.  No officer on scene had reasonable suspicion or probable cause to believe that Mr. Kulas had, since the trespass summons had been completed, committed any new offense justifying any form of detention or use of force.

     e.  Mr. Kulas in fact had not committed any new offense or engaged in any type of conduct justifying any form of detention or use of force.

43. Despite the foregoing realities, Defendant Park then grabbed the walking-away Mr. Kulas from behind, by the collar of his jacket, and attempted to slam him to the ground. Mr. Kulas was initially able to save himself from slamming into the ground by stumbling/walking backwards. But it did not last long.

44. Defendant Park, not letting go of Mr. Kulas's jacket and now attempting to wrench Mr. Kulas's wrist back behind him in a painful rear wristlock maneuver, continued attempting to slam Mr. Kulas to the pavement and within a couple seconds of further assaults upon Mr. Kulas's person, he successfully did so.

45. Mr. Kulas cried out in pain. Multiple other FCPS officers joined in the assault.

46. Defendant Officer Hanzlicek watched Defendant Park's unlawful takedown of Mr. Kulas and was personally aware of all the facts and circumstances which made it obviously a wrongful seizure and excessive force. Rather than intervene to stop this, however, he immediately joined in and assisted in the endeavor.

47. Defendant Hanzlicek grabbed Mr. Kulas's left arm and began violently twisting it backwards and out to inflict extreme pain on the helpless Mr. Kulas. He also put his knee into Mr. Kulas's back, making it hard for Mr. Kulas to breathe.

48. All of the FCPS officers began yelling out "stop resisting" at Mr. Kulas while he was on his stomach and they were attacking his helpless person.

49. It should be noted that not one of these officers had informed Mr. Kulas he was under arrest.

50. At least four FCPS officers piled on top of Mr. Kulas's body on the pavement. Mr. Kulas continued to cry out in pain, shock, confusion, and terror.

51. Defendant Park then slammed Mr. Kulas's head into the pavement, causing him pain and disorientation:

 

52. The officers rolled Mr. Kulas onto his back. They had both of his hands in their hands. Then they ordered him to roll onto his stomach (while not letting go of his hands or getting their weight off of his legs and stomach).

53. Defendant Park next used his entire forearm to choke Mr. Kulas. While choking Mr. Kulas, Park then grabbed his pepper spray. He told Mr. Kulas "comply or force will be used against you."

54. Mr. Kulas was not resisting (anything) and in fact had not yet received any order he was physically able to comply with.

55. Mr. Kulas, utterly helpless, just laid there.

56. Defendant Officer Hanzlicek knowingly applied violent and painful physical force to the helpless Mr. Kulas to assist Defendant Officer Park in physically attacking Mr. Kulas as retaliation for his earlier comments criticizing their actions.

57. Defendant Officer Hanzlicek knew he had a duty to intervene to stop this continued wrongful assault upon Mr. Kulas. Later, when interviewed by FCPS Internal Affairs' unit regarding failure to intervene during this event, Defendant Hanzlicek stated that since Park had slightly more experience than him, he decided he'd just assume that "Officer Park had a plan."

58. Officer Park used one arm to choke Mr. Kulas and his other hand to position his pepper spray to spray directly into Mr. Kulas's eyes:



59. While all the officers had Mr. Kulas choked and held down on his back, Defendant Park bizarrely demanded that Mr. Kulas "turn over." This was physically impossible and Park knew it, by virtue of his arm choking Mr. Kulas's neck alone. Mr. Kulas responded, "Are you serious right now?"

60. In response, Defendant Park sprayed his pepper spray directly into the restrained and helpless Mr. Kulas's eyes. He did this from just 1-2 inches away from Mr. Kulas's face.

61. FCPS officers receive training on how to safely use OC (oleoresin capsicum) or "pepper spray" on individuals. They learn in that training that they should never shoot pepper spray directly into someone's eyes from any distance closer than 3 feet due to a substantial risk of causing

serious bodily injury. The risk of serious bodily injury is caused by the "hydraulic needling effect," which is where particulates from the spray become permanently embedded in the eyeball.

62. Defendant Park received this training and, with knowing disregard for the health and safety of Mr. Kulas, sprayed OC spray directly into his eyes from just inches away anyway.

63. Mr. Kulas nearly lost consciousness from the amount of pain this inflicted. He suffered burns all over his face and on his eyes. He began crying and begging for help.

64. The officers continued physically assaulting Mr. Kulas on the cement as his body laid there, limp.

65. After putting Mr. Kulas in handcuffs, one of the officers announced (for the first time) that Mr. Kulas was under arrest.

66. This is what Mr. Kulas's face looked like just seconds afterward:



67. The officers next made no effort to obtain medical aid for Mr. Kulas, or to otherwise flush his eyes out, for over ten minutes.

68. As a result, Mr. Kulas's pain continued to increase, his face and continued to swell, and his eyes swelled shut, rendering him blind. Here is how he looked after two minutes:



69. Mr. Kulas begged the officers to get him water or milk to flush his eyes. He repeatedly told them he was in pain and had gone blind. They ignored him and did nothing to alleviate his suffering. They left him sitting in handcuffs on a bench on the sidewalk for all to see, ensuring that in addition to all this horrific pain and suffering that Mr. Kulas was further humiliated in public for as long as possible.

70. The pepper spray was also in Mr. Kulas's nose and throat. While moaning in pain and crying, he began to spit and dry heave.

71. The officers charged Mr. Kulas with the additional offenses of Obstructing a Peace Officer and Resisting Arrest. They took him to jail.

72. All of the charges against Mr. Kulas were ultimately dismissed.

73. Mr. Kulas was wearing contacts when Defendant Park sprayed pepper spray directly into his eyes. Contacts can trap harmful particles from pepper spray in the eye and because they interfere with the eye's ability to clean itself, they generally make the painful effects of the spray and the damage it inflicts far worse.

74. Not one FCPS officer asked Mr. Kulas if he had contacts in or attempted to remove his contacts for him. As a result, Mr. Kulas was forced to sit for an extended period of time, including being transported to the jail, with his contacts still trapping the pepper spray in his eyes, causing needless continuation of his severe pain, burning, and blindness.

75. Mr. Kulas was detained at the jail for over 36 hours. While there he was functionally blind and in complete agony from continued burning, swelling, tearing, and filled with terror that the damage Defendant Park had inflicted upon him would become permanent.

76. After finally being released from the jail, Mr. Kulas could not drive or function due to the ongoing swelling, tearing, and blindness. He could not work for 3 days. He had no one to take care of him at home. He stayed at home in pain, suffering, functionally blind, his eyes continuing to burn ceaselessly, while praying that his vision wouldn't be permanently damaged.

77. After a few days, the swelling and burning went down and Mr. Kulas's vision slowly returned. However, it was not the same vision that he had before. A permanent haze had developed in his vision. Everything he looked at had a slight cloudiness to it. This impact to his vision was permanent. To this day, two years later, there remains a slight cloudiness to Mr. Kulas's vision that was not there prior to Defendant Park's attack.

78. Mr. Kulas filed a complaint with FCPS for excessive force against Defendant Officer Park.

79. FCPS's professional standards unit informed Mr. Kulas they would investigate his claim. Several months later, they informed Mr. Kulas that the result of their investigation was "exoneration" of Defendant Officer Park and that they had found nothing wrong with Park's actions.

80. Utilizing Colorado's open record laws, Mr. Kulas's counsel requested a copy of the investigative report that had made these "exoneration" findings. A copy of this report is attached as **Exhibit 3** and incorporated into the factual allegations detailed in this Complaint.

81. Incredibly, the 29-page report openly admitted that the Defendant officers had no lawful reason to detain or use force on Mr. Kulas. Internal affairs plainly found multiple policy violations by the officers, both with respect to the unlawful seizure and with respect to the excessive force utilized. For example, from Internal Affairs' report:

> Officers had the opportunity and availability of other tactics to issue the summons to Mr. ███ The summons and ID could have been placed on the ground for him to pick up, or his ID could have been logged into safekeeping. More conversation should have been attempted. Once the summons was completed Mr. ███ was free to leave, and no use of force was authorized.

and:

> Mr. ███ Lieutenant ███ went on to explain that when OC is sprayed from the canister there is a minimum distance that it can be applied which is three feet. Lieutenant ███ went on to explain that applying it directly from the canister closer than three feet could potentially cause serious bodily injury through something called the hydraulic needling effect, which is where the particulates from the spray can become embedded in the eyeball.

and:

> Officers were in possession of Mr. ███ identification, and a summons had already been completed, and the charges were minor. Mr. ███ was not a threat to Officer Park or anyone else requiring that he continue to be detained in any way.

82. One would think that an Internal Affairs investigative report into a complaint of officer misconduct containing passages like those in the paragraph above would have to conclude with findings of policy violations and indicating that the misconduct allegations were sustained.

83. Yet, with no lawful basis for doing so, ***FCPS redacted those findings from the report*** before disclosing it to Mr. Kulas's counsel. As a result, the pages of the report containing the conclusions and findings of Internal Affairs investigator Lieutenant Sara Lynd look like this:



84. IA investigator Lieutenant Lynd sent this report and findings up the entire chain of command at FCPS, all the way up to and including Chief Jeffrey Swoboda.

85. Of course (see *infra*), it was and is long-standing FCPS practice and custom to model, condone, and ratify the use of violent takedowns and deployment of excessive force on helpless individuals. So rather than accept the inescapable findings made by their own Internal Affairs Unit, FCPS chain of command including Chief Swoboda elected to instead redact Lynd's findings and conclusions from the report and replace them – without explanation – with conclusory statements indicating that Defendant Park had been "EXONERATED" from the misconduct complaints:



Lieutenant Sara Lynd
Fort Collins Police Services

**FINAL FINDINGS:**

1.  Expectations of Conduct, Policy 340.3 Conduct that May Result in Discipline
    (m) Use of unnecessary force in the performance of duty or the mental or physical abuse
    of any person in custody.  **FINDING: Exonerated**

2.  Expectations of Conduct, Policy 340.3 Conduct that May Result in Discipline
    (r) Any conduct by an employee on or off-duty that tends to impair the effectiveness,
    efficiency, or morale of the Agency, may cause the public to lose confidence in the police
    department, violates the public trust or negatively affects the reputation of the Agency or
    any employee.  **FINDING: Exonerated**

16

86. Shortly after "exonerating" Defendant Park and openly ratifying his multiple policy and law violations in this case, Defendant FCPS chain of command and Chief Swoboda awarded Defendant Park the "Medal of Merit" in a large televised ceremony:



87. Upon information and belief, shortly after she issued her IA report and findings of misconduct against Defendant Park in this case, FCPS chain of command pulled Lieutenant Sara Lynd out of the Professional Standards Unit and reassigned her to the Crimes Against Persons Detective Unit so that they would not have to deal anymore with the mess of her actually doing her job and identifying FCPS officers' policy and civil rights violations in her written reports.

***PATTERN OF USING EXCESSIVE FORCE ON NON-THREATENING INDIVIDUALS:***

***Defendant Fort Collins's policies, customs, practices, and/or lack of adequate training and supervision caused the violations of Mr. Kulas's civil rights***

88. As witnessed *supra* and as detailed below, it is the custom and actual practice of FCPS to model, ratify, and condone the use of excessive force by FCPS officers. As a result, it has become customary among FCPS officers to use unjustified and excessive force on non-

threatening individuals because FCPS has communicated to its officers that such force is authorized, and, indeed, expected and when used will be defended and covered up by the supervisory and municipal apparatus of the City.

89. In fact, that is exactly what happened in this case. Defendant Park ignored his training regarding the risk of serious bodily injury presented by spraying OC spray into a person's eyes from inches away and did it to Mr. Kulas anyway. FCPS "investigated" this event and still found no misconduct on Park's part. Defendant Park ignored his training and the law he knew regarding Mr. Kulas being free to leave and Park having no lawful basis to take him down to the pavement or otherwise seize or detain him. FCPS "investigated" that behavior and still found no misconduct on his part. In fact, FCPS, following their internal "investigation," informed Mr. Kulas (without explanation) that they had "exonerated" Defendant Park with respect to Mr. Kulas's complaints of excessive force and misconduct.

90. FCPS's "exoneration" of Defendant Park despite his clear violation of training, policy, and deliberate infliction of pain and suffering upon Mr. Kulas exacerbated Mr. Kulas's damages and caused him to suffer even more trauma.

91. FCPS officers have repeatedly used excessive force against individuals like Mr. Kulas who presented no threat to officers. For instance, in December of 2013, FCPS officers similarly brutalized Stanley Cropp, an eighty-year-old man with Alzheimer's disease and dementia. Mr. Cropp was aggressively, unjustifiably, and unreasonably tackled by FCPS officers while taking a walk in his neighborhood. Mr. Cropp was taken to Larimer County jail. The excessive force claims against the City of Fort Collins and FCPS settled for $113,000.

92. In another case in 2016, FCPS officers similarly used excessive force against another member of the community. On or about October 20, 2016, FCPS officers seized Dakota McGrath, who

was suspected of third degree assault, a misdemeanor. Mr. McGrath, who had gotten out of his car and was walking in an alleyway, had earbuds in and did not hear the officer approach. The officer caught up to Mr. McGrath and struck him in the head or neck with a steel baton, causing Mr. McGrath to fall to the ground, unconscious. Mr. McGrath regained consciousness but remained on the ground, dazed, when the officer struck Mr. McGrath's leg several times with the baton, fracturing his leg in several places. On information and belief, the case was settled for an undisclosed amount.

93. In July of 2016, FCPS were called to Enan Joe Heneghan's house for a noise complaint. Mr. Heneghan turned down the music. The officer proceeded to search Mr. Heneghan's house without a warrant and without his consent, and unlawfully and unreasonably **pepper sprayed him in the face when he refused to show officers his ID**. The City of Fort Collins settled Mr. Heneghan's case for $150,000.

94. On December 3, 2016, Sean Slatton was ordered to leave his girlfriend's sorority party after being falsely accused of bringing a flask. FCPS officer Hopkins instructed Mr. Slatton to leave, and Mr. Slatton calmly and immediately complied. Mr. Slatton stood outside to order a ride service to drive him to his hotel. Two FCPS officers (Hopkins and Barnes) followed him outside and told him he needed to leave the entire property and could not wait on or near it for his ride. Mr. Slatton replied "ok, I will [leave]" but instead of permitting him to do so, Hopkins and Barnes demanded to see his identification. Mr. Slatton refused and walked away because he had not committed a crime and so that he could comply with officer Hopkins's original order to leave. **Upon reaching the sidewalk, Hopkins told Mr. Slatton he was under arrest, and without provocation, struck him in the leg with a baton and pepper sprayed him in the face**.

95. On April 6, 2017, Michaella Surat was outside a bar in Fort Collins celebrating her 22nd birthday when police officers were called regarding an altercation inside the bar. When Ms. Surat approached officers who were speaking with her boyfriend, one officer told her to "back off" and pushed her shoulder. Ms. Surat told the officer not to touch her. The officer then grabbed and held onto Ms. Surat's wrist and put her in a rear wristlock hold. Ms. Surat repeatedly asked the officer why he was touching her and what she did wrong. The officer responded by slamming Ms. Surat face-first to the ground – clearly an excessive use of force on someone who posed no danger to the officer. Ms. Surat's chin slammed into the sidewalk, causing a concussion, cervical strain, and a large and painful contusion on her chin.

96. After video footage of Ms. Surat's encounter with FCPS surfaced, FCPS spokesperson Kate Kimble told the media that the officer used "standard arrest control," ratifying and making explicit Fort Collins' custom and practice of use of excessive force.

97. On October 6, 2017, an FCPS officer accosted Kimberly Chancellor apparently because she did not get her ID out of her purse quickly enough. He threw her face-down on the asphalt and then, while she was prone on the ground not resisting or threatening him in any way, the officer pinned her to the ground with his knee and bodyweight on his back.

98. On March 29, 2018, FCPS officers used excessive force against Natasha Patnode, a woman accused of shoplifting at a Target store. An FCPS officer struck Ms. Patnode more than 60 times with his fist or baton while she was already on the ground and restrained. Another FCPS officer arrived and the officers tased Ms. Patnode multiple times, also while she was already on the ground and restrained. The FCPC officers' use of force blatantly violated the Fourth Amendment's requirement that use of force on citizens be reasonable.

99. On April 10, 2023, FCPS officers used excessive force against Christopher Finn by tasing him in the back when they saw him run away. At the time FCPS officers tased Mr. Finn, all they knew was that he matched the description in terms of clothing items he was wearing of someone who had just been reported to have shoplifted a $49 pair of pants from Dick's Sporting Goods store. Shoplifting an item worth $49 is a petty offense in Colorado. FCPS officer Kilcoyne approached Mr. Finn outside the store and asked him how he was doing and if he had ID on him. He did not tell Mr. Finn he was detained, under arrest, or not free to leave. Mr. Finn said he did not have his ID and then attempted to run away. Officer Kilcoyne immediately pulled out his Taser as he gave chase and within four seconds, without uttering a single word (not "stop," not "you're under arrest," not "you will be tased"), **tased him in the back while Mr. Finn was running in a parking lot at a full sprint**. The tase caused Mr. Finn to suffer complete neuromuscular incapacitation (NMI) immediately, which sent his body and face straight down into the pavement without the use his hands to break his fall. Mr. Finn suffered a broken nose, a horrifically bloodied face requiring several stitches to close, a severe concussion and TBI, cracked sternum, and multiple bloody contusions to his arms. Upon information and belief, this use of force was reviewed by FCPS's chain of command and ratified despite the multiple obvious policy and civil rights violations seen in the video.

100.    At the time of Defendant Park's and Hanzlicek's assault on Mr. Kulas, Defendant Fort Collins knew or had constructive knowledge, based on its history and widespread practice of its officers using excessive force on non-threatening individuals and its condoning of those actions, that its officers would utilize excessive and unnecessary force against people like Mr. Kulas.

101.  Because Defendant Fort Collins created and tolerate a custom of deliberate indifference and has continuously failed, despite the obvious need to do so, to adequately train and supervise FCPS officers in these areas, citizens, including Mr. Kulas, have repeatedly been subjected to excessive force and violations of their constitutional rights.

102.  Defendant Fort Collins has fostered a policy of inaction and/or express ratification of its officers routinely violating citizens' constitutional rights, which constitutes the functional equivalent of a decision by Fort Collins itself to violate the Constitution.

103.  FCPS's persistent and repeated failure to discipline its officers for their similar uses of excessive force reflects a custom, policy, or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regiment of training provided by Fort Collins, and that such conduct is customary within FCPS.

104.  FCPS's deliberate and conscious failure to correct prior constitutional violations based on similar conduct constituted an affirmative choice to ratify the conduct, and to send a clear message in doing so to its law enforcement officers that such misconduct is acceptable and approved. It is Fort Collins' responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify and encourage, their improper conduct, so that officers can learn from theirs and others behavior and perform their jobs lawfully moving forward, and be deterred from engaging in misconduct that violates the constitutional rights of people with whom the police interact. Fort Collins' failure to do so has clearly communicated to FCPS's officers, including Defendant Park, that excessive force is authorized and tacitly or explicitly encouraged.

105.    Fort Collins' past ratification and toleration of similar illegal conduct thus caused and was the moving force behind Defendant Park's use of excessive force against Mr. Kulas.

### *Defendant Fort Collins is liable for Defendant Park's violation of Mr. Kulas's rights*

106.    The unlawful conduct of FCPS officers, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

107.    Given FCPS's history and widespread practice of officers using excessive force, Fort Collins knew of the need to provide additional or better training and supervision in this respect and made a deliberate choice to not adequately train or supervise its officers in avoiding the use of excessive force.

108.    Fort Collins knew or should have known that its acts or omissions in this regard were substantially certain to cause FCPS officers to violate individuals' constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of failing to provide adequate, additional, or better training and supervision to FCPS officers regarding how to avoid excessive force.

109.    Defendant Fort Collins was deliberately indifferent to Plaintiff's constitutional rights, because Fort Collins knew that individuals in Mr. Kulas's position would be at a substantial risk of suffering dangerous consequences from Fort Collins' failure to properly train and supervise its employees.

110.    Defendant Fort Collins could have and should have pursued reasonable methods for the training and supervising of such employees, or for disciplining them if they engaged in misconduct, but it intentionally chose not to do so, instead going the route of regularly ratifying and approving of such observably unlawful misconduct.

111.    Defendant Fort Collins's policy of failing to act in the face of a history of excessive force against citizens, and its custom, policy, and practice in failing to properly train and supervise its employees despite such history and knowledge or constructive knowledge of such history, were the moving force and proximate cause of Defendant Park's violation of Mr. Kulas's constitutional rights.

112.    Defendant Fort Collins's custom, policy, and practice of encouraging, condoning, tolerating, and ratifying excessive force, as described herein, and the subsequent cover-ups of such constitutional violations, were the moving force behind and the proximate cause of, Defendant Parks's violation of Mr. Kulas's constitutional rights.

113.    Defendant Fort Collins's acts or omissions caused Mr. Kulas damages in that he suffered physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, and sense of security and individual dignity, among other injuries, damages, and losses.

114.    Defendant Fort Collins's actions, as described herein, deprived Mr. Kulas of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the Colorado state constitution, and caused him other damages.

115.    All of the acts described herein were done by Defendant Park intentionally, knowingly, willfully, wantonly, maliciously, and/or recklessly in disregard of Mr. Kulas's state- and federally-protected constitutional rights, and were done pursuant to the preexisting, deliberately indifferent official custom, policy, practice, training, and supervision provided to its officers by FCPS.

116.    Plaintiff experienced physical pain, trauma and suffering as a result of the Defendants' unlawful conduct and violations of his civil rights.

117.    Plaintiff also suffered impairment of reputation, personal humiliation, mental anguish, and suffering by virtue of the unlawful actions of these Defendants as set forth herein, for which he is entitled to compensation.

118.    All of the Defendants' actions as described herein were taken under color of state law.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – 4th Amendment Violation – False Arrest/Imprisonment (Arrest Without Warrant or Probable Cause)*
(against Defendants Park, Hanzlicek, and Fort Collins)

### *DEFENDANT PARK*

119.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

120.    When Defendant Park offered Mr. Kulas the summons and Mr. Kulas refused to accept it, there existed at that time neither probable cause nor reasonable suspicion to detain or use force with Mr. Kulas.

121.    It was within Mr. Kulas's rights to decline to physically hold onto the summons that Defendant Park had served on him, and he was entirely free to walk away from the encounter, which he attempted to do.

122.    Defendant Park however, hellbent on retaliating against Mr. Kulas for him being critical of the police and not accepting the summons he had served on him, decided to pursue and attack Mr. Kulas. This was a warrantless seizure and arrest of Mr. Kulas, made without probable cause (or even reasonable suspicion) for such seizure, in violation of the Fourth Amendment.

123.    Defendant Park knew that Mr. Kulas had committed no new crime or offense after being handed the summons for the petty trespass, and he similarly knew that FCPS possessed no probable cause to believe that Mr. Kulas had in those few seconds committed a new criminal offense, and yet he arrested and unlawfully seized him anyway, with deliberate indifference to Mr. Kulas's rights under the Fourth Amendment to the U.S. Constitution.

124.    Defendant Park's sudden seizure and assault on Mr. Kulas caused him to experience great physical pain and terror. The experience of this event caused and continues to cause Mr. Kulas trauma and emotional distress.

### DEFENDANT AVERY HANZLICEK

125.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

126.    Defendant Hanzlicek observed Defendant Park attempt to unlawfully seize Mr. Kulas with no lawful justification for doing so.

127.    Defendant Hanzlicek observed Defendant Park utilize reckless force and dangerous unapproved takedown methods to tackle Mr. Kulas to the pavement without justification.

128.    Defendant Hanzlicek knew and had observed that Mr. Kulas was not a threat to the officers and, at the time he was initially attacked by Defendant Park, was free to leave and in fact was walking away from the officers.

129.    Defendant Hanzlicek knew that he was required by FCPS policy and Colorado law to intervene to prevent Defendant Park from attacking and conducting a lawless, retaliatory arrest upon Mr. Kulas.

130.   Rather than abide either of those duties, Defendant Hanzlicek elected to personally assist Defendant Park in both unlawfully seizing Mr. Kulas and in utilizing extreme excessive force to unlawfully seize him.

131.   Defendant Hanzlicek had more than reasonable opportunity to speak up and stop Defendant Park's attack. Instead of speaking up, he helped Park in the attack.

132.   If Defendant Hanzlicek had said or done anything to intervene or stop Defendant Park's behavior, it would have saved Mr. Kulas from suffering the horrific physical and psychological injuries he did in this incident.

### *DEFENDANT FORT COLLINS*

133.   Defendant City of Fort Collins is a governmental entity and municipality incorporated under the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Fort Collins Police Services is a department of the City of Fort Collins. Defendant City of Fort Collins enforces local and state law through its law enforcement agency, the Fort Collins Police Services ("FCPS").

134.   Defendant Fort Collins had a duty to train and supervise Defendant Park.

135.   At all times relevant to this Complaint, Defendant City of Fort Collins employed and was responsible for the promulgation of policies, customs, practices and training of FCPS personnel, including Officer Park.

136.   Defendant Fort Collins was aware that its officers regularly arrested citizens without probable cause and did nothing to remedy or stop it. To the contrary, FCPS would instead condone and ratify such misconduct after the fact, making it more likely to occur in the future.

137.   Both Fort Collins's failure to supervise and train Park, as well as its aforementioned unconstitutional customs/practices, were the moving force behind Mr. Kulas's wrongful arrest.

138.     Defendant Fort Collins' actions and omissions violated Plaintiff's federal constitutional rights, and were a substantial and significant contributing cause and proximate cause of Plaintiff's damages.

139.     Defendant Fort Collins did not act upon a good faith and reasonable belief that their actions and omissions in failing to adequately train and supervise FCPS officers in this area was lawful.

140.     The Defendants' conduct proximately caused injuries, damages, and losses to Mr. Kulas.

**SECOND CLAIM FOR RELIEF**
***Section 13-21-131, C.R.S. – Arrest Without Probable Cause***
***Violation of Colorado Constitution, Article II, Section 7***
(against Defendants Park, Hanzlicek)

141.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

142.     Section 13-21-131 of the Colorado Revised Statutes directs that any peace officer who "subjects or causes to be subjected, including failure to intervene, any other person to the deprivation of any individual rights … secured by the bill of rights, article II of the state constitution is liable to the injured party for legal or equitable relief or any other appropriate relief."

143.     Statutory immunities and statutory limitations on liability, damages, or attorneys fees do not apply to claims brought pursuant to § 13-21-131.

144.     Defendant Park was a police officer under Colo. Rev. Stat. § 24-31-901(3), employed by the City of Fort Collins and its Police Department at the time he wrongfully seized, arrested and maliciously prosecuted Mr. Kulas.

145.     **Once Mr. Kulas the summons for petty trespass was offered to him and refused, Defendant Park knew he did not have probable cause or reasonable suspicion or any**

**other legally valid basis to believe that Mr. Kulas had committed, was committing, or was about to commit any new crime**.

146.  **Defendant Park admitted this when interviewed by FCPS's Professional Standards Unit for the internal investigation into his conduct in this case**.

147.  Defendant Officer Park nevertheless decided to unreasonably seized and arrested Mr. Kulas, in violation of his rights under the Constitution of the State of Colorado.

148.  Officer Park did not at any time have a warrant authorizing his seizure or arrest of Mr. Kulas.

149.  Officer Park violated Mr. Kulas's state constitutional rights by engaging in an unlawful seizure of Mr. Kulas that was objectively unreasonable in light of the facts and circumstances confronting him before, during and after his encounter with Mr. Kulas.

150.  Officer Hanzlicek violated Mr. Kulas's state constitutional rights by assisting and personally participating in Park's unlawful seizure of Mr. Kulas and failing to intervene to stop that unlawful seizure, which he knew to be objectively unreasonable in light of the facts and circumstances confronting him before, during, and after his encounter with Mr. Kulas.

151.  Defendants Park and Hanzlicek knowingly violated Mr. Kulas's individual rights as secured by the bill of rights of the Colorado Constitution.

152.  Defendants Park and Hanzlicek did not act upon a good faith and reasonable belief that their actions in seizing Plaintiff without probable cause or reasonable suspicion was lawful.

153.  The actions and omissions of the Defendants Park and Hanzlicek were the moving force behind, and the proximate cause of, injuries sustained by Mr. Kulas.

154.  Defendant Park's and Hanzlicek's wrongful arrest and humiliation of Mr. Kulas caused him to experience extraordinary stress, expense, depression, terror and anxiety. The experience

of this event caused and continues to cause Mr. Kulas trauma and emotional distress, loss of any feeling of safety or security, along with other damages and injuries described herein.

### THIRD CLAIM FOR RELIEF
*42 U.S.C. § 1983 – 4th Amendment Violation – Excessive Force*
(against Defendants Park, Hanzlicek, and Fort Collins)

### *DEFENDANTS PARK AND HANZLICEK*

155.  Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

156.  Defendant Park's arrest of Mr. Kulas, in addition to being wrongful and unlawful, also utilized excessive force in violation of the Fourth Amendment.

157.  No officer would consider Defendant Park's sudden and unannounced deployment of painful force upon Mr. Kulas – grabbing the back of his jacket, swinging his body to the ground, slamming his head into the pavement, choking him with his forearm across Mr. Kulas's neck, and then spraying pepper spray directly into Mr. Kulas's eyes from just two inches away for several seconds – to have been reasonable or justified under the circumstances.

158.  Defendant Hanzlicek personally participated in and materially assisted with Defendant Park's use of excessive force upon Mr. Kulas knowing that it was a violation of Mr. Kulas's rights under the Fourth Amendment to the U.S. Constitution.

159.  Defendant Park effected this assault and injury to Mr. Kulas with deliberate indifference to Mr. Kulas's rights under the Fourth Amendment to the U.S. Constitution.

160.  Defendant Park's and Hanzlicek's sudden seizure and attack upon Mr. Kulas caused him to experience great physical pain, suffering, and terror. The experience of this event caused and continues to cause Mr. Kulas trauma, permanent damage to his vision, and emotional distress.

### DEFENDANT FORT COLLINS

161. Defendant City of Fort Collins is a governmental entity and municipality incorporated under the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Fort Collins Police Services is a department of the City of Fort Collins. Defendant City of Fort Collins enforces local and state law through its law enforcement agency, the Fort Collins Police Services ("FCPS").

162. Defendant Fort Collins had a duty to train and supervise Defendant Park and his fellow officers.

163. At all times relevant to this Complaint, Defendant City of Fort Collins employed and was responsible for the promulgation of policies, customs, practices and training of FCPS personnel, including Officers Park and Hanzlicek.

164. Defendant Fort Collins was aware that its officers regularly arrested citizens using excessive force and did nothing to remedy or stop it. To the contrary, FCPS would instead condone and ratify brutal excessive force activity after the fact, making it more likely to occur in the future.

165. Both Fort Collins' failure to supervise and train Park, as well as its aforementioned unconstitutional customs and practices, were the moving force behind Mr. Kulas's wrongful arrest and injuries.

166. Defendant Fort Collins' actions and omissions violated Plaintiff's federal constitutional rights, and were a substantial and significant contributing cause and proximate cause of Plaintiff's damages.

167. Defendant Fort Collins did not act upon a good faith and reasonable belief that their actions and omissions in failing to adequately train and supervise FCPS officers in this area was lawful.

168.    The Defendants' conduct proximately caused injuries, damages, and losses to Mr. Kulas.

**FOURTH CLAIM FOR RELIEF**
*Section 13-21-131, C.R.S. – Excessive Force*
*Violation of Colorado Constitution, Article II, Section 7*
(against Defendants Park and Hanzlicek)

169.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

170.    Defendants Park and Hanzlicek acted under color of state law and within the course and scope of their employment as FCPS police officers at all times relevant to the allegations in this Complaint.

171.    At all relevant times, Defendants Park and Hanzlicek were "peace officers" under § 24-31-901(3), C.R.S. and were employed by a local government.

172.    Plaintiff Mr. Kulas had a protected interest under the Colorado Constitution, article II, § 7 in being secure in his person from excessive force by law enforcement personnel.

173.    Officers Park and Hanzlicek employed excessive force on Mr. Kulas by means that included but were not limited to, shoving him, grabbing him, tackling him, choking him, slamming his head into pavement, kneeing him, painfully twisting his arms behind his back, spraying pepper spray directly into his eyes from inches away, handcuffing him, and detaining him, in violation of the Constitution of the State of Colorado.

174.    Defendants Park and Hanzlicek did not have a warrant authorizing their seizure of Mr. Kulas.

175.    Defendants Park and Hanzlicek had no reasonable basis to believe Mr. Kulas posed a threat of harm to the officers or anyone else. In fact, at the time the various forms of excessive force

were employed against Mr. Kulas, Mr. Kulas was walking away and/or fully restrained and/or completely helpless.

176.   The force used against Mr. Kulas by Defendants Park and Hanzlicek, as described herein, was objectively unreasonable and excessive.

177.   Defendants Park and Hanzlicek subjected or caused Mr. Kulas to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

178.   Defendants Park and Hanzlicek did not act upon a good faith and reasonable belief that their actions in using unreasonable and excessive force against Mr. Kulas were lawful.

179.   The acts or omissions of Defendants Park and Hanzlicek were the moving force behind and the proximate cause of injuries sustained by Mr. Kulas.

**FIFTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Violation of First Amendment – Retaliation for Exercise of First Amendment*
(against Defendant Park)

180.   Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

181.   It is clearly established that an act taken by law enforcement in retaliation for the exercise of a constitutionally protected right is actionable under 42 U.S.C. § 1983.

182.   Mr. Kulas had a First Amendment right to criticize FCPS officers and to walk away after being offered the completed summons for petty offense trespass.

183.   Defendant Park's decision to grab Mr. Kulas, subject him to a painful wristlock maneuver without warning, shove him, swing tackle him to the ground by grabbing the back of his jacket, choke him, and then spray from just two inches away pepper spray directly into Mr. Kulas's open eyes were plainly actions taken in retaliation for Mr. Kulas exercising his First

Amendment right to free speech. Defendant Park retaliated upon Mr. Kulas with excessive and painful force, as well as an unlawful and unconstitutional search/seizure.

184.    Defendant Park's malicious retaliation continued when he charged Mr. Kulas with the misdemeanor offenses of Resisting Arrest and Obstruction, which he knew Mr. Kulas had not committed and which he intended Mr. Kulas to go to jail for.

185.    The actions as described herein, taken in retaliation against Mr. Kulas for his exercise of First Amendment rights, while proximately causing and contributing to the various damages already outlined above, also proximately caused Mr. Kulas to suffer separate and independent additional damages in the form of chilling his freedom of speech right by foreseeably causing him to ever exercise it again in the presence of law enforcement. Indeed, Mr. Kulas remains abruptly and wholly terrified to this day of any interaction with law enforcement, and of speaking against any officer he encounters, out of the fear and trauma instilled in him by Defendant Park's retaliatory actions taken that day.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mr. Kulas respectfully requests that this Court enter judgment in his favor and against the Defendants and grant:

a.   Appropriate declaratory and other injunctive and/or equitable relief;

b.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

c.   All economic losses on all claims allowed by law;

d.   Punitive damages on all claims allowed by law and in an amount to be determined at trial;

e.   Attorneys' fees and the costs associated with this action on all claims allowed by law;

f.   Pre- and post-judgment interest at the lawful rate; and

g.   Any further relief that this Court deems just and proper, and any other relief as allowed by law.

## VII. REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial to a jury on all issues so triable.

Respectfully submitted this 27th day of August, 2023.

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke
Counsel for Plaintiff
The Life & Liberty Law Office LLC
1209 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com

HALTZMAN LAW FIRM, P.C.

*/s/ Matthew Haltzman*
Matthew A. Haltzman
Counsel for Plaintiff
Haltzman Law Firm PC
204 Maple St. Unit 101
Fort Collins, CO 80521
Phone Number: (970) 692-3440
Matthew@haltzmanlaw.com